UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

| TERRANCE WASHINGTON | : | DOCKET NO. 6:10 CV 1486 |
|---|---|---|
| VS. | : | JUDGE DOHERTY |
| BP AMERICA, INC., ET AL. | : | MAGISTRATE JUDGE HILL |

### RULING ON MOTION TO REMAND

Pending before the undersigned is the plaintiff's Motion to Remand this suit to the 16th Judicial District Court in St. Martin Parish, Louisiana. [rec. doc. 10]. The defendants have filed Opposition, to which plaintiff filed a Reply. [rec. docs. 17-19 and 22]. On December 15, 2010, the Motion to Remand was pretermitted, pending discovery limited to those issues raised by the Motion. [rec. doc. 23]. Following additional discovery, the defendants filed an additional Opposition, to which plaintiff filed another Reply. [rec. docs. 44 and 48]. A Motion to Reopen the remand proceeding was granted on June 20, 2012 and oral argument was heard on that same day. [rec. doc. 50]. For the following reasons, the Motion to Remand is **DENIED**.

### Background

On August 17, 2010, plaintiff, Terrance Washington, filed a Jones Act negligence claim in the 16th Judicial District Court in St. Martin Parish, Louisiana, alleging personal injury as a result of slipping and falling on a walkway while working as a cook on the Thunder Horse. The Thunder Horse is allegedly owned and operated by BP America,

Inc., BP Exploration & Production, Inc., and/or BP Production North America, Inc., (collectively "BP"). [rec. doc. 1-1, ¶ 2 and 3].

The Thunder Horse is a production drilling quarters located approximately 175 miles southeast of New Orleans, Louisiana on the Outer Continental Shelf. The facility displaces some 130,000 tons and floats with the benefit of four large, partially submerged buoyant columns. The structure was towed to the site in the Mississippi Canyon of the Gulf of Mexico and then secured to the Outer Continental Shelf with 16 wire and chain mooring lines attached to 19-foot wide piles driven 90 feet into the seabed. Eight hydrocarbon production lines also connect the Thunder Horse to the seabed.

To service multiple wellheads at the site, the Thunder Horse can move within a 350-foot radius by tightening and slackening its mooring lines. In 2005, Hurricane Dennis temporarily forced the Thunder Horse outside this radius and caused it to list. Apart from this one instance, the Thunder Horse has stayed within the 350-foot radius. BP plans to keep the facility secured to the Outer Continental Shelf for an estimated 25 years, the productive life of the wells it services. BP estimates that an effort to detach the mooring lines, secure the wells, and transport the production drilling quarters elsewhere would cost approximately $400 million. Though it can reposition itself by manipulating its mooring lines, the Thunder Horse has no means of self-propulsion. It also has no raked bow.

On September 24, 2010, BP removed this case to federal court on the basis of federal question jurisdiction, contending that Washington's claims arise under federal

law, specifically the Outer Continental Shelf Lands Act ("OCSLA"), 43 U.S.C. § 1301 *et seq*. BP further alleged that plaintiff had failed to state any claim for relief or right of recovery under the Jones Act.

## LAW AND ANALYSIS

**Standard of Removal of alleged fraudulently pleaded Jones Act claims**

The United States Court of Appeals for the Fifth Circuit has stated, as a general rule, that Jones Act cases are not removable. *Holmes v. Atlantic Sounding Co., Inc.*, 437 F.3d 441, 445 (5th Cir. 2006). "A fraudulently pleaded Jones Act claim does not, however, bar removal." *Id*. "A defendant may 'pierce the pleadings to show that the Jones Act has been fraudulently pleaded to prevent removal.'" *Id*. (*quoting Burchett v. Cargill, Inc.*, 48 F.3d 173, 175 (5th Cir. 1995)). "The district court may use a summary judgment-like procedure to determine whether a plaintiff has fraudulently pleaded a Jones Act claim." *Id*. (quotations omitted). "The court may deny remand where, but only where, resolving all disputed facts and ambiguities in current substantive law in plaintiff's favor, the court determines that the plaintiff has no possibility of establishing a Jones Act claim on the merits." *Id*.

**Seaman Status**

To qualify as a seaman under the Jones Act, "an employee must first demonstrate that his duties 'contribute to the function of the vessel or to the accomplishment of its mission.' *Id. (quoting Chandris, Inc. v. Latsis*, 515 U.S. 347, 359 (1995)). Second, "a seaman must have a connection to a vessel in navigation (or an identifiable group of

vessels) that is substantial in terms of both its duration and its nature." *Id*. The defendants contend that the Thunder Horse is not a "vessel" for purposes of the Jones Act. Thus if the defendants meet their burden and demonstrate that no genuine issue of material fact exists and that the Thunder Horse is not a Jones Act "vessel", removal was proper and remand must be denied.

**Vessel Status**

"The term 'vessel' has . . . escaped precise definition." *Holmes,* 437 F.3d at 446. Before *Holmes*, the Fifth Circuit's vessel status jurisprudence focused on two multi-factor tests. The first test looked to "the purpose for which the craft is constructed." *Holmes*, 437 F.3d at 446.[1] A second test was used to determine "the business in which [the craft] is engaged." *Id*.[2]

---

[1] To determine the purpose for which a craft is constructed, courts have considered:

(1) whether the owner assembled or constructed the craft to transport passengers, cargo, or equipment across navigable waters; (2) whether the craft is engaged in that service; (3) whether the owner intended to move the craft on a regular basis; (4) the length of time that the craft has remained stationary; and (5) the existence of other "objective vessel features," such as: (a) navigational aids; (b) lifeboats and other life-saving equipment; (c) a raked bow; (d) bilge pumps; (e) crew quarters; and (f) registration with the Coast Guard as a vessel.

*Holmes*, 437 F.3d at 446.

[2] The Fifth Circuit applied a three-prong test to determine whether a watercraft was a Jones Act vessel:

(1) The structure was constructed to be used primarily as a work platform;
(2) the structure is moored or otherwise secured at the time of the accident; and
(3) although the platform is capable of movement, and is sometimes moved across navigable waters in the course of normal operations, any transportation function is merely incidental to the platform's primary purpose.

*Holmes*, 437 F.3d at 446-47; *see also Fields v. Pool Offshore, Inc.*, 182 F.3d 353, 357-358 (5th Cir. 1999).

In 2005, the United States Supreme Court reexamined the definition of vessel in the context of the Longshore and Harbor Workers' Compensation Act ("LHWCA"). *Stewart v. Dutra Const. Co.*, 543 U.S. 481,488-97, 125 S.Ct. 1118, 160 L.Ed.2d 932 (2005).  In *Stewart*, the Court stated that the term "vessel" for the purposes of the LHWCA is defined by 1 U.S.C. § 3 as "every description of water-craft or other artificial contrivance used, or capable of being used, as a means of transportation on water." *Stewart,* 543 U.S. at 489.  Consistent with this definition, the Court determined that any "watercraft" "practically capable of maritime transportation, regardless of its primary purpose or state of transit at a particular moment" is a vessel under the LHWCA. *Id*. at 497.  Accordingly, "[t]he question remains in all cases whether the watercraft's use as a means of transportation on water is a practical possibility or merely a theoretical one." *Id*. at 496.

In *Holmes*, the Fifth Circuit concluded that "*Stewart*'s definition of 'vessel' applies equally to the Jones Act and the LHWCA . . . ."  *Holmes*, 437 F. 3d at 448.  Accordingly, a Jones Act "vessel" includes any watercraft "practically capable of maritime transportation . . . ."  *Id*.  Although the Fifth Circuit did not expressly overrule its prior jurisprudence regarding vessel status, the *Holmes* Court acknowledged that "the class of water-borne structures that are vessels for . . . [the] Jones Act is broader than we have heretofore held."  *Id*. at 449.

Though *Stewart* broadened the class of structures that qualify as Jones Act vessels, limits still exist.  Recently, the Fifth Circuit addressed the issue of whether a spar is a

vessel for purposes of Jones Act liability. *Mendez v. Anadarko Petroleum Corp.*, 466 Fed. Appx. 316 (5th Cir. 2012).[3] In *Mendez*, the RED HAWK spar was a floating gas-production platform moored in ocean water 5,000 feet deep approximately 210 miles from Sabine Pass, Texas. The RED HAWK had been moored since 2004, and was secured to the ocean floor by six single-point anchor moorings comprised of a chain and polyester line 78 feet long. Each line was anchored to the sea floor with a suction embedment anchor approximately 18 feet in diameter, and was permanently taut so that the spar could not move laterally. Additionally, the spar was attached to the sea floor by an underwater infrastructure of flow lines and export pipeline systems, as well as umbilicals extending from the spar to the subsea wellheads, used to transport oil and gas to shore-based facilities. Plaintiff's employer, Anadarko Petroleum Corp., intended the spar to remain in place for the productive life of the field.

Using the test in *Stewart*, the Court found that the RED HAWK spar was not a vessel. It observed that although the spar floated, it was permanently moored by six 78-foot-long mooring lines that were attached to 18–foot anchors deeply embedded into the sea floor under 5,000 feet of water. Additionally, steel flow lines and export pipelines further attached the spar to extraction points in one direction and to an onshore production facility in Louisiana, via another platform, in another direction.

---

[3] The Court recognizes that this case was not selected for publication under Fed. R. App. P. 32.1. *See also* Fifth Circuit Rules 28.7, 47.5.3, 47.5.4. Therefore, this Court is not bound to follow the Fifth Circuit decision. However, this Court agrees with the reasoning of the Fifth Circuit in *Mendez* and finds it persuasive.

The Court also noted that the RED HAWK was permanently affixed to the sea floor and could only be moved after detaching the substantial moorings and pipelines that had been joined to its structure. Further, the relocation study showed that moving the spar would involve detaching all the moorings and severing the pipelines, would take nearly two months, would cost $42 million, and would require abandoning the mooring system and building a new mooring system at the new site. The study also revealed that, at most, the RED HAWK was theoretically capable of maritime transportation but not practically capable.

Citing *Stewart* (where the Supreme Court discussed approvingly the Fifth Circuit's decision in *Pavone v. Miss. Riverboat Amusement Corp*., 52 F.3d 560, 570 (5th Cir.1995), holding that a floating casino moored to the shore in a semi-permanent or indefinite manner was no longer a vessel, as an example of the "sensible" rule that "ships . . . do not remain vessels merely because of the remote possibility that they may one day sail again," (*Id*. at 494)), *Mendez* held that the RED HAWK made an even stronger case for non-vessel status, reasoning as follows:

> With 50 days and $42 million dollars, one could undoubtedly disconnect the electrical, water, telephone, and other hookups that attach a casino boat to the shore, allowing it to move on water. See *id*. at 564 (acknowledging that all that was necessary to disconnect the casino boat from the shore was "removing the steel pins from the ramps [that connected the casino boat to the pier] and letting loose all lines and cables"). Disconnecting the RED HAWK from the sea floor would make disconnecting a casino boat from the shore look as easy as unplugging a toaster. The RED HAWK, therefore, embodies the distinction between theoretical capability, which it has, and practical capability, which it does not. *Stewart*, 543 U.S. at 496, 125 S.Ct.

>   1118 ("The question remains in all cases whether the watercraft's use as a means of transportation on water is a practical possibility or merely a theoretical one.") (internal quotation marks omitted).

*Id*. at 319.

Similar to the RED HAWK, the Thunder Horse is a floating production drilling quarters which is permanently moored by 16 mooring cables (as opposed to six on the RED HAWK) attached to 16 separate anchor pilings each driven approximately 90 feet into the seabed under 6,000 feet of water (compared to 5,000 for the RED HAWK). Relocating the Thunder Horse would cost approximately $400 million (compared to $42 million for the RED HAWK). Also, as is the case with the RED HAWK, the Thunder Horse is further secured through an underwater infrastructure of production lines. Finally, like the RED HAWK, the Thunder Horse was intended to remain in place for the duration of its useful life.

The majority of district courts within the Fifth Circuit, including this Court, have held that a spar is not a vessel in the context of a Jones Act personal injury action. *Moore v. Bis Salamis, Inc.*, 748 F.Supp.2d 598 (E.D. Tex. 2010); *Rushing v. Pride Intern., Inc.*, 2011 WL 3021043 (S.D. Tex. July 22, 2011); *Richardson v. Kerr-McGee Oil & Gas Corporation*, 2011 WL 2565315 (E.D. La. June 28, 2011) (Berrigan, J.); *Channel v. Grand Island Shipyard, Inc.*, 2001 WL 515220 (E.D. La. May 1, 2001); *Pupusha v. Murphy Exploration & Production Co.-USA, et al*, Docket No. 06-0549 (E.D. La. June 14, 2006) (Duvall, J.); *Soileau v. Nabors Offshore Company*, Docket No. 04-2334 (W.D. La. April 27, 2006) (Haik, J.) (granting summary judgment on the grounds that a spar was

permanently moored and not a "vessel" within the intendment of general maritime law or the Jones Act). The undersigned has recently followed the reasoning of these cases. *See* Memorandum Ruling, *Hefren v. Murphy Exploration and Production, et. al*, Docket no. 12-1899 (W.D. La., October 25, 2012).

The plaintiff would have this Court distinguish the spar in *Mendez* and similar spars from the Thunder Horse. Specifically, the plaintiff stresses that whereas the RED HAWK has permanently taut mooring lines and was unable to move laterally, the Thunder Horse does move laterally within its 350-foot radius by tightening and slackening its mooring lines. Ultimately, the Court concludes that this lateral movement does not convert the Thunder Horse into a Jones Act vessel for several reasons.

First, the *Stewart* test is not whether a structure is capable of lateral movement, but whether it is "practically capable of maritime transportation . . . ." *Stewart*, 543 U.S. at 497. The Fifth Circuit concluded in *Fields* that a floating platform capable of moving 250-feet in any direction by tightening and slackening its mooring chains was not a Jones Act vessel. *See Fields*, 182 F.3d at 359. Though *Fields* was decided pre-*Stewart*, the post-*Stewart* court in *Mendez* still cited *Fields* as authority in determining Jones Act vessel status:

> The district court determined that Mendez could not establish a connection to a vessel in navigation because the RED HAWK is not a vessel in navigation as the Supreme Court has defined that term. We held that a spar almost identical to the RED HAWK was not a vessel in *Fields v. Pool Offshore*, 182 F.3d 353 (5th Cir. 1999). We therefore agree with the district

court's conclusion.[4]

*Mendez*, 466 Fed. Appx, at 318.

Second, while the Fifth Circuit has yet to apply the *Stewart* and *Holmes* analysis to floating platforms such as the Thunder Horse, district courts in the Fifth Circuit have applied the *Stewart* and *Holmes* analysis to the Thunder Horse and consistently determined that the Thunder Horse is not a vessel for Jones Act purposes and, accordingly, denied remand on that basis. *Moore*, 748 F.Supp.2d at 603-08 ("[B]ecause of its extensive attachment to the ocean floor and long-term commitment to a single location, . . . the Thunder Horse is a work platform that is permanently attached to the seabed and not a Jones Act vessel."); *Rushing v. Pride Intern., Inc.*, 2011 WL 3021043 (S.D. Tex. July 22, 2011) (concluding that the Thunder Horse is a floating platform and not a vessel); *see also Scroggs v. Big Salamis, Inc.*, 2010 WL 3910563 (E.D. Tex. Oct. 5, 2010) (granting summary judgment on plaintiff's Jones Act claims because the Thunder Horse is a work platform, not a Jones Act vessel). Though these cases are not binding on this Court, the Court finds their reasoning persuasive, and adopts their reasoning.

Finally, the Thunder Horse's non-vessel status is consistent with the Fifth Circuit's recent decision in *ACE American Ins. Co. v. M-I, L.L.C.*, - - F.3d - -, 2012 WL 5077684 (5th Cir. Oct. 19, 2012), in which the Fifth Circuit characterized the Thunder

---

[4] As the Court in *Moore* recognized, "the *Holmes* court applied some of the pre-*Stewart* factors in its analysis of the facts before it . . ." including the objective vessel features such as raked bow, flotation tanks and anchors. *Moore*, 748 F.Supp.2d at 605

Horse as a stationary platform, and held that the plaintiff's work performed on the Thunder Horse was not maritime in nature, and that the choice of laws provision in a master service agreement applied because the Thunder Horse was permanently attached to the Outer Continental Shelf.

## CONCLUSION

For the foregoing reasons, the undersigned concludes that, for purposes of remand, there is no possibility that plaintiff, Terrance Washington, is a Jones Act seaman because the Thunder Horse is not a vessel within the meaning of the Jones Act.  Hence the Jones Act does not bar removal.  Accordingly, the Motion to Remand is **DENIED**.

Signed this 16th day of November, 2012, at Lafayette, Louisiana.

						_____
						C. MICHAEL HILL
						UNITED STATES MAGISTRATE JUDGE